who was tried in the same 38-day prosecution as Mr. Fable, and I'd like to pull out a bit from the minutia of VIN numbers and talk about the problems that resulted from the government's use, almost exclusive use, of informants in this case. And in looking at the issues that Mr. Rollness has raised in his brief, and the overall problems with the fairness of the trial that he received in this case, it's fair to say that they all stem from the fact that the government had a paucity of forensic or independent evidence regarding the assault in this case and the murder, and instead chose to rely on the facially incredible and insubstantial testimony of four informants. We have challenged the sufficiency of the evidence for both the robbery and the murder based upon their testimony, and this Court has heard several times this morning the standard of review for sufficiency of evidence claims, so I won't repeat it here. And I'm not going to spend a lot of time talking about the various problems with the informant's testimony that are well-detailed in our briefing, except to say that in this case, every single one of the – first, the murder went unsolved for four to six years, depending upon how you determine when it was solved. And witnesses only came forward when it became apparent to them that there was substantial benefit to be gained by blaming Mr. Rollness and Mr. Binder for the murder in their own criminal prosecutions or other legal difficulties. And even the United States Supreme Court has recognized the substantial danger that arises when the government rests their case on witnesses such as them. But in particular, in this case, the violence, the act of violence that leads to a life sentence in this case, the murder, had to be for the purpose that Mr. Rollness would increase or maintain or increase his status within the Hells Angels Motorcycle Club. And the government's argument in closing was that the evidence of this was that Mr. Rollness received a filthy few patch. But the evidence doesn't substantiate the claim that that patch increased – maintained or increased Mr. Rollness's status in the club or necessarily was given only for acts of violence. First of all, Mr. Rollness was, by the government's own evidence, a member of the Hells Angels Motorcycle Club before the murder occurred. There were no rules of the – you know, if you look at this Court's other RICO cases where clubs have certain rules, an initiation requires an act of violence or murder or whatever, there was no testimony that that was required of Mr. Rollness. There was testimony that the filthy few patch was shipped in bulk to clubs. Mr. Fukuyama – I think I'm saying his name correctly – testified in trial that he had shipped out a bulk order of 100 patches to clubs in the West, and that was unimpeached. There was evidence that Mr. Rollness talked about enforcing certain rules of the club, but there's no evidence that those were required of him as a part of his membership. There's nothing – there's no requirement that they be required. There isn't – isn't it appropriate to infer from the evidence that, you know, he was concerned about people laying claim to membership who weren't members. He had engaged in a prior attack just for that same purpose in that, you know, he went with another Hells Angel to do it, and he was invited to the party by another Hells Angel. So why can't you infer from all that that his purpose was to maintain or increase his standing within that community? Because I think it's irrelevant what Mr. Rollness thought he might be doing. It's a more – it's an outward-looking requirement. It has to maintain or increase his status in the club, and there was no evidence that it did. He may have internally felt that this was something that a Hells – Or is there an objective requirement? It says maintain or increase the position in the Hells Angels and that it be an integral part under the banks. Well, integral part is one thing. The purpose of maintaining your standing or increasing it is another, right? That's correct. So if he feels that it's important to himself, that's not an integral part of club membership because nothing in the organization – I think it's two different things. One is being an integral part of club membership. I don't know whether they have bylaws or not or whatever, but that's one thing. But the other thing is I just think I'm going to look cool to those people who I want to look cool to. Doesn't that show a purpose of acting in order to be perceived as cool? Only if there's evidence that that does either maintain your evidence in the organization – and he was already a member, he didn't need to do this to get into the club, as some of the cases have talked about, street gangs and that kind of thing. He didn't need to take over, let's suppose, from Mr. Fable. There was no testimony that that was required, but that was his goal. And there's no testimony in increase to standing in the club. There wasn't any in – which is the – gosh, I've lost the name of the case. Banks? The case where the guy acted in order for his homies to, you know, look up to him. That's correct. That his testimony – he had made statements on the street. There was no testimony here that Mr. Rolness, his status was increased within the club. In fact, it appears that shortly thereafter he left the club. He didn't get the vice presidency as a result of this. He didn't get more – a new motorcycle. The government's theory was he got a patch that is only given for murder. Well, that theory, I think, was completely debunked by – Not by the jury, apparently. I mean, there's testimony both ways. I mean, the jury said, hey, it was for murder. It wasn't just for staying late and being part of the cleanup crew at the party. The point Judge Reimer is making is it doesn't matter what actually happened. It's whether he thought that this was going to do something for him. I don't think the statute is that narrow. I think it's broader than that. It's to maintain or increase your status in the organization, not in your head. So there has to be some relationship between that and the way the organization views you. And there was no testimony about that at all. And, in fact, none of the informants even testified that in some way that increased Mr. Rolnes' status within the club. Nonetheless, moving along to the other, I think, particularly important issue in this case, and that is the treatment of Sean Lundy, the jailhouse informant, and the introduction of his statements that Mr. Rolnes confessed the murder to him in the federal detention center. And Mr. Lundy's testimony, we argue, was inadmissible under the Messiah case. The government argues, and I'm sure this Court is well aware that in order for the government's argument is that in order for the statements to be inadmissible when someone is charged and has the appointment of counsel, the government has to actually sit down with the informant before the statements are elicited from the defendant and have an agreement. That's too narrow a view of the case law, and, in fact, the agreement can be expressed or implied in terms of the agency of the informant in terms of eliciting the statement. In this case, there was clear evidence that Mr. Lundy elicited statements from Mr. Rolnes. Mr. Lundy was candid in his testimony that when he arrived at the FDC, he befriended Mr. Rolnes and started writing down everything Mr. Rolnes said to him. That's his own testimony. He was also quite candid that every time he lands in an institution, he begins to act as an informant because he has in the past and received substantial benefits on sentencing and sentencing breaks. Okay. That's his motivation. What about the government's involvement? The government in this case, the government's involvement in this case is what they, not Mr. Lange. Our argument is it's a more overarching involvement, that because Mr. Lundy has worked with the government in the past, he knows precisely what to do, and it's not necessary that he sit down with Mr. Lange or Mr. Miyake or Ms. Gorman in order to become a government agent. Now, I know the government's argument is, one, the case law is currently not that broad, but it certainly doesn't prohibit that, and, two, that that would make every jailhouse snitch an informant. But it won't because Mr. Lundy had the kind of experience with doing this that places him in a different class. He wasn't a passive listener. He wasn't a first-timer in the system who happened to overhear a comment. He deliberately befriended Mr. Rolness to get something back from the government, and he knew he would get it. It's a combination of the unfettered charging discretions that the prosecutors hold in the federal system, the effect of the minimum mandatory sentences that Congress has put in place, and the effect of the 5K1.1. It's a growing problem in the federal system, and inmates, particularly sophisticated inmates, he was probably the most articulate of all of the informants the government brought forward in this case used to their advantage. So our theory is that this was an implied agreement with Mr. Lundy and that all of his statements regarding what he said Mr. Rolness said to him should have been suppressed. Finally, I'd like to talk for a moment about the vouching of the testimony for Mr. Jeff Mercer, also known as Snake. His testimony went to the issue of whether or not Mr. Rolness had participated in the assault on Funny Sonny. I'm sorry, I have a better memory for the names than I do for the actual names of the witnesses in this case. But nonetheless, Mr. Mercer said throughout the pretrial period that he didn't remember, the defense theory was he said throughout the pretrial period he didn't remember this assault. Nobody hit Funny Sonny. Certainly he minimized his involvement and the involvement of anyone else. The defense theory going into the trial was he was remembering some activity with Mr. Rolness and Mr. Binder, but not the assault on Funny Sonny. During trial and the night before his testimony, Mr. Mercer had an epiphany. He remembered now that Mr. Binder and Mr. Rolness had been involved and in fact hit Funny Sonny. At that point, the government gave Mr. Mercer not just immunity, they gave him immunity from a charge of perjury. Wasn't it a little bit more specific, that is, that the grand jury, he had testified that, you know, he hadn't hit, had or hadn't, I've forgotten which one it was now, and at trial it said he had. Yes. So it was colliding stories. Directly contradictory. The judge got a little bothered and the government said, well, just to put all this out on the table, we'll give him immunity. Now, I had a little hard time understanding why the effect of the immunity was to put the government's prestige behind one story or the other. I don't get it. I mean, exactly. They were just saying, okay, fine, he's not going to get, whichever one was the perjury, whichever story was the perjury, we're going to give him immunity for it so that he can freely be on the hot seat. Well, one, it wasn't either story. The government believed the second story because it fit with their theory of the case. And so what you're telling the jury is, we believe him so much now that we're going to forgive his lie to the grand jury. That seems to me to be the ultimate in vouching. We're going to relieve him of the requirements of the oath. Well, the government didn't say any such thing, right? Well, that's the way it could certainly be understood. Telling the jury we've relieved him of, and the statute doesn't really, in my view, give the government the power to do so, although we do have a difference of opinion about it. So you seem to argue that they shouldn't have given him immunity. Okay, but the argument that they've advanced to the district court, I think, was that we're doing it because if he comes in now in on cross and is confronted with the risk of perjury, the defense won't get a chance to cross-examine, right? That was their ostensible reason. That was. And the cure for that was to place the prestige of the United States Attorney's Office behind him by saying, okay, we won't prosecute him for perjury. What would you have had them do in that case, then? Not grant him immunity. Not grant him immunity. And then he comes on the stand and then invokes his Fifth Amendment right. And he wouldn't testify. He wouldn't testify. And that would have been fine with the defense. Absolutely fine with the defense. Okay. And that should have been the approach. And the cross-examination. Pardon me? Not to have been able to cross. Well, they should have stricken his direct. I mean, we start getting into all sorts of. . . Yeah, you don't get to cross-examine. If they take the Fifth, I think the solution then is you strike all of his testimony. Yes. Yes. But certainly that is a better solution than to say, we believe Mr. Mercer's current story so much we're going to forgive his lie under oath to the grand jury. Because if the U.S. Attorney doesn't think he's lying now, why would we, the jury, find him to be a liar? I would like to save my remaining one minute. Out of which you have none. Oh. But thank you for. . . We'll see. Thank you for your argument. Ms. Bruner, I guess we're back to you again. Thank you, Your Honor. And for the record, again, my name is Helen Bruner. Let me start with the murder charge, since that's the most serious charge and the arguments that counsel has made regarding sufficiency of the evidence. I do think in this case there was more than sufficient evidence to hold Mr. Rolness accountable for the Vicar murder and the racketeering act in count one with which he was convicted that also relates to the murder, as well as the 924C count, which was count four. With respect to, first of all, the Vicar murder charge, counsel has argued that there was insufficient evidence to show that this was for the purpose of maintaining or increasing his status in the Hells Angels. And I think, actually, that that does miss the point. It does relate to Mr. Rolness's view of his status, and it does relate to the club in terms of the reasons for this particular murder. I think the evidence that was before the court and before the jury is multifold on that point. We know that he, from Mr. Yates, that he discussed Santa at the club meeting or church meetings and the fact that he was falsely representing himself to be a Hells Angel. We know from Mr. Rolness's own statements that were admitted at trial that he was aware that, for example, people who misrepresented themselves or had club paraphernalia that they weren't supposed to have, that you had to take those things away from those people. We know that he talks about ---- Well, can I ask where you're going? Are you agreeing that there has to be some objective evidence that shows that the club itself viewed this as important? No, Your Honor, not at all. If this guy comes along as a freelancer, as the club enforcer, and there were no patch, that still would be enough? I believe, Your Honor, that yes, provided, of course, this was all tied to achieving status. But here we have both. So he, in a false sense of being an enforcer, being important to go out and knock somebody off, he goes ahead and does it. And the club doesn't react. I mean, the guy's a wacko, they say, and he thinks that's okay. They don't tell him not to. But in their perspective, they don't give him a patch. They don't do anything to show any kind of reaction or enhancement of his status. He just now feels that he will be more respected and he'll be feared or whatever it is. You think that's all you need to show, that in his own, his mens rea was he thought it would advance his status and that's enough, even if the club didn't care? Well, Your Honor, to answer the court's question, yes, if that was the substantial purpose. But having said that, Your Honor, I'm not suggesting that that was the only evidence here. I think there's way more evidence here. So I think I didn't mean to. No, I'm just troubled that that's all it is. I've sort of read the statute as essentially going after gangbangers. You want to get into the club. You go shoot somebody. You do a drive-by shooting, whatever, to show that you're made of the stuff. Whether or not it's a requirement, that's the kind of thing that people will appreciate. You get some benefit from it. Look at it from the club's standpoint. Well, I think let's look at it from the club's standpoint. And there's been discussion about what the filthy few patch meant and the government's focus on the filthy few patch. But I would point to one piece of evidence that was introduced at trial that sort of summed it up for me as I was looking through the trial evidence. And that was a drawing that was actually hanging on the walls of Mr. Fable's house. And quite frankly, the words in our brief didn't quite do it justice. It has across the top the words filthy few. And the drawing, which is maybe about 12 inches by 18 inches, has on it a gentleman who purports to be a hell's angel. He has a hell's angel's tattoo across his chest and on his belt buckle. Sort of big, beefy, muscly guy. And instead of a head or face, he has the hell's angel's death head with the helmet with the wings off of it. And in his hand is an automatic firearm, handgun, with the smoke coming off the firearm. And at his feet is a body with a hole in the head, blood coming out of the head and coming out of the mouth. That sort of imagery and that sort of artwork and that sort of glorification of violence was precisely to why Mr. Rolness, not only if he had his own belief that this would enhance his status in the club, that taken with the other statements in the trial and with the kind of glorification of violence that the club itself has proves that element. What exactly is the evidence of his, Rolness's view that this was going to enhance? What do we have that he subjectively thought that? Well, I think you have several things. And obviously we have to infer this from the evidence that was presented. I think you have that first from the statements that he made to Mr. Lundy. What did he say? He said, I got my filthy few patch for doing this. So he's already showing pride. I find Mr. Lundy, I'd like to find evidence someplace else than from Mr. Lundy's mouth. Well, then let's go secondarily to what does he do after Mr. Walsh is murdered. He orders filthy few banners for the club. Now, that was not before, it was after. We know as well that he brings up Mr. Walsh, Santa, at club meetings and expresses great concern and the need to punish and the need to carry out the punishment on behalf of the club. We know that Mr. Foster, who arranges the party, is a Hells Angels hang around. We know that Mr. Wellness comes to the party with other club members. Had he, for example, not thought that this was part of the club or enhancing his status in the club, there would be no reason for him to arrange it through members of the club or hang arounds or have other members of the club there. So we have all of that. We have his comments, Mr. Selig, Leonard Selig's testimony about the comments about Santa during the assault when they find the picture in his apartment that includes Santa and the need to punish Santa. So I think when you take all of those things together, Mr. Wellness clearly thought, I think that the inference that could be drawn is that Mr. Wellness thought that committing this murder would enhance his status in the organization. In fact, it didn't. Is that right? Well, I think he says to Mr. Lundy that he, and again, I recognize that the Court would rather it come from someplace else, but I think it's probably an accurate statement that he himself decided it was a better idea when the heat was on him for the murder not to be a member of the club any longer. So whether it ultimately did or it didn't, I don't think is really the standard of proof, however. I think the question is whether or not it was done for that purpose, and I think the evidence clearly shows that. And since the Court expressed concern about Mr. Lundy, let me just quickly turn to that for a moment, because I do think that the standard that the defense wishes this Court to adopt is way too broad. There is nothing in the record that shows that the government had knowledge of what Mr. Lundy was doing, that it approved of it or that it in any way encouraged or accepted it. It's clear, I think, from the record that no one was aware of his activities until May when he himself came forward with it. So under those standards, I don't think the government should be held accountable for Mr. Lundy's actions. What evidence is there that Lundy had previously been a snitch for the government? I believe the record established quite clearly, and now I apologize, Your Honor, I don't remember whether it was the testimony, the direct testimony before the jury or the hearing that related to Mr. Lundy's testimony, but it very clearly shows that when he was prosecuted in Connecticut, I believe in 1990, that he cooperated with the government and actually made a number of undercover telephone calls and buys. With respect to his second drug conviction in the Western District of Washington in, I believe, 1994, he provided additional information, but in that instance did not get a 5K motion. That was all in the record. So, and then he was, of course, back here because of the escape charge, which in effect was a walk-away escape. So he, well, what I think the defense wants here is a rule that would in effect, I mean, if you take their argument to their logical conclusion, if 5K, if Section 5K of the sentencing guidelines or prosecutorial discretion means that people who inform our jailhouse informants should not be spoken to, in effect you're saying that we should never talk to any jailhouse informant because I dare say that any jailhouse informant. That might be a good rule. That might be a good rule certainly from the defense's perspective, but I dare say almost any defense lawyer probably has the conversation with counsel about what sort of cooperation might you give to lower your sentence, and that should not be attributed to the government. Can I ask you a question about one of the prosecutor's closing arguments where the one that talks about Tiananmen Square and standing up in the jury, he says the action of bullies is just one form of injustice and so on, some more sensational than others. You could stand in front of a tank in Tiananmen Square. You could march in Washington, or you can do what you're doing. You could sit as a juror to represent the community. Isn't that improper argument to take the jury, make it sort of standing out there as protesting against the violence that's out there instead of dealing with the facts of the case? Your Honor, I believe that in this case, well, let me answer your question directly. I would prefer that was not in the record. But I think what we have here is a situation where you had two days of argument, basically, and these were the rebuttal comments after what might best be described in the words of the district court, a blistering attack on the government's case, on the government's investigation, and on the government's prosecutive team and investigators. And I think if one looks at those comments at the end of the rebuttal, first of all, the district court very quickly cut it off and very quickly told the jury that it was improper argument and not appropriate. I think all of that goes to show that even if this court finds those comments were error, that any error here was not prejudicial, particularly when one looks at the result here, the jury's verdict. And I think if one looks at that, you see that the jury in this case was very careful to parse and was very careful not to allow prejudice and community concerns to affect its decision. For example, one part of that comment relates to the Walsh family. Mr. Fable was also charged in connection with the murder as one of the racketeering acts, as was Mr. Binder. They were not convicted of those charges. Mr. Jenks, they hung on all the counts related to him. So if talking about Tiananmen Square and community standards really had sway here, we would have seen a way different result in the jury verdict. I think it's unfortunate. You know, as an appellate counsel here arguing before this court, I would much prefer that we had a standard of perfection that really human nature makes that almost impossible. And rather, I think what the standard shows here is that Mr. Rolness had a very fair trial, and we would ask the Court to affirm. Okay. Thank you, Ms. Porter. How about 30 seconds' worth of rebuttal? Thank you, Your Honor. I appreciate it. In terms of the issue regarding how the individual views the acts of violence, and that's relationship to the enterprise, I think first you have to start with the fact that the RICO statute is an organizational statute. It's designed to take on organizations. So that's kind of the framework. And then I would commend the Court to United States v. Conception, which is the Second Circuit case cited in my brief, which talks about the violent crimes committed as an integral aspect of membership. Not necessarily just what's going on in Mr. Rolness's head, but also with the membership and how it increases his status. Finally, as to informants and the difficult problems of informants in the federal system, I would like to just leave the Court with this thought. You no longer have to talk to the U.S. attorney. It's embodied in law. Being a snitch pays off under 5K1.1. I think it's fallacious to say you must talk to the U.S. attorney first. Anyone who has more than one experience with a federal conviction realizes relatively early that the way to go is to get information against the highest valued defendant who's also incarcerated with you. So thank you very much for your time. Thank you, Ms. Elliott. Thank you, Ms. Brunner. The matter just argued will be submitted. And our next argument is by telephone.
judges: Fletcher, Rymer, Fisher